**Lloyd A.R. MUHAMMAD, Plaintiff,**

v.

**Joseph E. BUTLER, et al., Defendants.**

Civ. A. No. 84–1822.

United States District Court,
D. New Jersey.

Jan. 13, 1987.

Stanley J. Hausman, Caldwell, N.J., for plaintiff.

Catherine M. Brown, Deputy Atty. Gen., Office of Atty. Gen. of N.J., Trenton, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

In this action by a prisoner alleging a procedural due process violation, defendants object to Magistrate Hedges' report and recommendation of November 18, 1986. The court affirms and adopts the Magistrate's recommendation.

### BACKGROUND [1]

Plaintiff, Lloyd Muhammad, a prisoner at Rahway, is serving a life term for murder. On August 12, 1984, plaintiff was transferred from Rahway Camp to the prison, and on September 12, 1984, his custody status was increased from "full minimum" to "gang minimum." The prison took this action to discipline plaintiff for allegedly planning to escape. The disciplinary charge was based on a telephone call from a former acquaintance of plaintiff that warned prison authorities of plaintiff's alleged plans to escape.

In an order and opinion filed December 5, 1985, 655 F.Supp. 1466, this court held that the prison's actions violated the due process rights of plaintiff. The court granted plaintiff preliminary injunctive relief and ordered that he be restored to full minimum custody status "unless a formal disciplinary hearing is forthwith conducted pursuant to Department of Corrections Standard 254."

On February 4, 1986, Michael Wiechnik, a disciplinary hearing officer for the Department of Corrections, conducted the hearing contemplated in the court's order. Prior to the hearing, Muhammad had been informed that he was charged with planning to escape and that the charge was based on "information from civilian Esther Williams." *See* Exhibit Joint–1 from Magistrate's hearing of October 23, 1986.

---

1. The following statement draws from Magistrate Hedges' findings of fact, to which neither party has objected.

The principal evidence against plaintiff was a telephone call from the above-mentioned Ms. Williams, a former girlfriend of plaintiff. During the phone call of August 30, 1984, Ms. Williams informed Rahway investigator Ortiz that plaintiff was attempting to escape. Wiechnik had listened to a tape recording of this conversation prior to the hearing. At the hearing, Wiechnik did not play the tape recording; Wiechnik told plaintiff what he considered to be the relevant statements. Plaintiff introduced, in response, three letters from Williams to plaintiff, indicating that Williams was upset with plaintiff. Plaintiff suggested that Williams had fabricated the story of planned escape in response to plaintiff's having broken off their relationship.

Wiechnik was uncertain about Muhammad's guilt or innocence at the conclusion of the February 4 hearing. He advised Muhammad that he would undertake a further investigation and offered Muhammad the opportunity to take a polygraph test. Wiechnik then adjourned the hearing.

In the interim, Muhammad refused to take the polygraph test, on advice of his attorney. Muhammad was reluctant to sign the necessary waiver form for the test.

Wiechnik obtained a transcript of the phone conversation. Wiechnik did not advise Muhammad of the existence of the transcript. Wiechnik also obtained a statement from investigator Ortiz regarding Ms. Williams' credibility. Ortiz stated that he believed Ms. Williams, because she referred to information that she could not have known unless an inmate had told her. (Apparently, this information is that an inmate's clothing and money are taken from them upon entering prison.)

The hearing resumed on March 11, 1986. At the hearing, Wiechnik marked in evidence the following items: the tape recording itself, a transcript of the recording, the original Internal Affairs report of the phone call and charge, the memorandum from Ortiz on Williams' credibility, and documents relating to plaintiff's failure to take the polygraph examination. Wiechnik

marked all of these items as confidential—plaintiff was given no opportunity to see the documents. Wiechnik made no independent determination whether the documents were confidential, but relied solely on the Department of Corrections finding that the documents should be treated as confidential. The "Adjudication of Disciplinary Charge" states that the materials were withheld from the inmate "to preserve source/security." Exhibit J–2.

At the resumed hearing, Wiechnik found Muhammad guilty. Apparently, Wiechnik found Ms. Williams' to be credible. Wiechnik's reports contain no reference to plaintiff's failure to take the polygraph examination.

In an order dated July 15, 1986, this court referred to Magistrate Hedges the question of whether the hearing conducted by Wiechnik afforded plaintiff appropriate due process protections. Magistrate Hedges conducted a hearing on October 23, 1986; plaintiff Muhammad and Michael Wiechnik testified.

The Magistrate issued a report and recommendation on November 18, 1986. The Magistrate found that the disciplinary hearing afforded plaintiff was not consistent with federal constitutional due process concerns, because of Wiechnik's use of confidential information. The Magistrate also found that the hearing raised questions under state law, but that the eleventh amendment, as interpreted by the *Pennhurst* decision, bars this court from addressing these concerns. The Magistrate recommended that Muhammad be restored to minimum custody forthwith, that his claims for injunctive relief under state law be dismissed, and the court address Muhammad's claims for damages, if any.

The defendants object to the magistrate's recommendation of injunctive relief under federal law. Plaintiff has offered no objection to the report and recommendation.

DISCUSSION

Defendants specifically object to two aspects of the report and recommendation. First, defendants object to the Magistrate's

conclusion of law that the hearing officer, by his use of "confidential" information, violated plaintiff's federal. due process rights. Second, defendants object to the recommended remedy of restoring plaintiff to minimum custody, because any error committed was not outcome-determinative, and thus harmless.

### A. *Use of confidential information*

The magistrate's conclusion that plaintiff was denied due process rested on two findings. First, it is undisputed that Wiechnik made no independent determination to treat any document as confidential, even though the applicable regulations vested him with such discretion. Second, the magistrate found that no credible reasons are presented in the record to justify the confidentiality finding by the Department of Corrections (which Wiechnik adopted). Report and Recommendation, at 1481. The magistrate concluded that these actions violated the limited due process requirements for prison disciplinary hearings set forth by the Supreme Court. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Helms v. Hewitt,* 655 F.2d 487 (3d Cir.1981).

Defendants claim that the procedure employed by Wiechnik—relating portions of the confidential documents that Wiechnik deemed relevant to plaintiff at the hearing—is constitutionally sufficient. Defendants stress that plaintiff knew of the charges against him by Ms. Williams and that he had an opportunity to respond at the hearing. Defendants contend that the magistrate's ruling conflicts with the holding of *Wolff* that a prisoner is not entitled to rights of confrontation or cross examination in a disciplinary hearing. Defendants claim that "[plaintiff's] right to present a defense was not in any way abridged by the failure of the hearing officer to permit him to examine the documentary evidence." Defendants' objections to magistrate's report, at 6.

The court finds defendants' position untenable. The sole evidence against plaintiff was the telephone conversation between Ms. Williams and Investigator Ortiz.

Plaintiff was never given the opportunity to hear this conversation or to read the transcript. Plaintiff had some opportunity to respond to Ms. Williams general allegation, but his right to present a defense was clearly abridged by his inability to review these statements.

■ In determining what process is due a prisoner in a disciplinary hearing, a court must "adjust the tensions between the necessity for efficient and orderly administration of state prisons on the one hand and the protection of important constitutional interests of their inmates on the other." *Helms v. Hewitt,* 655 F.2d 487, 489 (3d Cir.1981). Legitimate concerns of prison administration may justify deviation from the traditional due process model. Thus, prison officials can refuse to disclose confidential documents if disclosure would impair prison control or jeopardize informants. *See Calloway v. Fauver,* 544 F.Supp. 584, 604 (D.N.J.1982). In this case, however, no legitimate rationale has been offered for the refusal to disclose the tape or transcript of the Williams conversation. The proferred reason—"to preserve/protect security"—is unpersuasive given that the prison authorities had earlier informed plaintiff that Williams' statements were the basis for the charge.

Unquestionably, plaintiff was given some opportunity to respond to the evidence against him. Such limited opportunity might be constitutionally sufficient if the limitations were taken in aid of a legitimate concern of prison administration. However, even a prisoner, with his curtailed constitutional protection, has a right to be free from arbitrary government action. The prison authorities cannot arbitrarily limit the plaintiff's rights, simply because they have afforded him *some* procedural protections.

■ The court affirms and adopts the Magistrate's conclusion that the hearing officer's use of confidential information violated the plaintiff's due process rights.

### B. *Harmless error*

Defendants contend that any error made by the hearing officer was harmless, and

therefore cannot be the basis for preliminary relief. Defendants argue that the failure to disclose the confidential material was not outcome-determinative, so that plaintiff is entitled to damages only.

The court disagrees. Defendants' failure to disclose the transcript of the Williams-Ortiz phone call—the sole evidence behind the charge of planning an escape—may very well have determined the outcome of the hearing. The transcript reveals that Williams alluded to certain occurrences that Ortiz interpreted as preparation for escape—that Muhammad wanted the keys to Williams' apartment (Defendants' Exhibit 5 at Magistrate's hearing, at 1), that Muhammad spoke of being at Williams' doorstep one day (Defendants' Exhibit 5, at 2), that Muhammad asked Williams for money (Defendants' Exhibit 5, at 4). Williams told Ortiz that Muhammad had spoken of "plans," but that Muhammad never told Williams what those plans involved. Defendants' Exhibit 5 at 2, 5). Ms. Williams did not mention "escape" until Investigator Ortiz suggested that Muhammad was planning to escape.[2]

■ At the hearing, Wiechnik told Muhammad that Ms. Williams had stated that Muhammad has plans to escape. Without knowledge of the transcript, Muhammad could not know upon what statements Ms. Williams' contention was based (nor that Ortiz, in fact, first raised the issue.) Muhammad states that, had he known of the contents of the transcript, he would have explained that his "plans" were pending applications in the state courts that could have secured his early release. Given the difficulty had by Wiechnik in making his credibility determination,[3] the court finds that the failure to disclose the transcript to Muhammad—and Muhammad's consequent inability to explain Ms. Williams' specific remarks—was potentially outcome determinative.

Thus, the court holds that the violation of Muhammad's due process rights was not harmless error.

## CONCLUSION

The court adopts and affirms the magistrate's report and recommendation. The court grants the requested injunctive relief on plaintiff's federal claim and thus directs that plaintiff be restored to minimum custody forthwith.[4] The court directs that plaintiff's claims for injunctive relief under state law are dismissed.

## ORDER

This matter having been opened to the court by plaintiff's complaint seeking injunctive and monetary relief; and the court having referred to Magistrate Ronald J. Hedges the following question for preparation of a report and recommended disposition pursuant to 28 U.S.C. 636(b)(1)(B), Fed. R.Civ.P. 72(b), and Rule 40(A)(2) of the General Rules of this court:

> Did the disciplinary hearing conducted pursuant to this Court's December 5, 1985 Opinion and Order afford plaintiff appropriate due process protections as outlined in the court's opinion and as otherwise required by law?;

and the Magistrate having conducted a hearing and filed a report and recommendation dated November 18, 1986; and the defendants having objected to the Magistrate's recommendation insofar as it awards injunctive relief to the plaintiff; and the court having considered the written

---

**2.** The first exchange concerning an escape is recorded in the transcript at page 3—A.O. is investigator Ortiz, E.W. is Ms. Williams.

> "A.O.: Alright, so what are you saying to me, that he was planning to escape, outright?
> E.W.: Well;
> A.O.: Or he contemplated it.
> E.W.: The only time I knew he was probably think about skipping was when he told me about my door step and my apartment."

**3.** Wiechnik could not make any credibility determination at the end of the initial hearing.

Transcript of Proceedings of October 23, 1986, before Magistrate Hedges, at 81:6 to 9. Wiechnik credited Ms. Williams' statements, and thus found Muhammad guilty, only after consulting with investigator Ortiz and reviewing the transcript of Ms. Williams' phone call. *Id.* at 107–108.

**4.** The court adopts the Magistrate's caveat that this restoration is subject to any intervening disciplinary proceedings which may have changed plaintiff's custody status.

submissions of the parties and heard oral argument; and for the reasons expressed in the accompanying opinion,

IT IS this 12 day of January, 1987, hereby

ORDERED that the recommendation of the Magistrate is affirmed and adopted, and it is further

ORDERED that the plaintiff be restored to minimum custody forthwith, subject to any intervening disciplinary proceedings which may have resulted in changes to plaintiff's status, and it is further

ORDERED that plaintiff's claims for injunctive relief under state law are dismissed, and it is further

ORDERED that the parties attend a conference with Magistrate Hedges to be held at 10:00 AM on February 9, 1987, to discuss resolution of plaintiff's damage claims.

## REPORT AND RECOMMENDATION

RONALD J. HEDGES, United States Magistrate.

## INTRODUCTION

On December 5, 1985 the Honorable H. Lee Sarokin issued an Order and Opinion on the application of plaintiff Lloyd A.R. Muhammad ("Muhammad") for a temporary restraining order and preliminary injunction and on defendants' cross-motion to dismiss. 655 F.Supp. 1466. Pursuant to that Order and Opinion, Muhammad was to be restored to "full minimum" custody status unless a formal disciplinary hearing pursuant to New Jersey Department of Corrections Standard 254 *et seq.* was conducted forthwith.

Pursuant to Order filed July 15, 1986 there was a referral to me to answer the following question:

Did the disciplinary hearing conducted pursuant to this Court's December 5, 1985 Opinion and Order afford plaintiff appropriate due process protections as

outlined in the court's opinion and as otherwise required by law?

I conducted a hearing on October 23, 1986.

## FINDINGS OF FACT

The hearing contemplated by the December 5, 1985 Order and Opinion was to have commenced at Rahway State Prison ("Rahway") on January 27, 1986. The hearing had not been conducted earlier inasmuch as the defendants had sought and obtained a stay of the December 5, 1985 Order pending their appeal to the Third Circuit Court of Appeals. The January 27 hearing was adjourned with Muhammad's consent and the hearing commenced on February 4, 1986 (Defendants' Exhibit 1).

The hearing was conducted by Michael R. Wiechnik ("Wiechnik"). Wiechnik has been employed by the New Jersey Department of Corrections in the capacity of Disciplinary Hearing Officer since June, 1983.

Before the hearing commenced Wiechnik visited the Internal Affairs Unit at Rahway. At that time he was given documents relating to the hearing by a "recording officer." These documents were determined by Rahway to be pertinent. Among the documents given to Wiechnik were a "Disciplinary Report" (Exhibit J-1)[1] and an Internal Affairs report to the Rahway Superintendent dated September 4, 1984 (Defendants' Exhibit 2). In addition, Wiechnik discussed the circumstances surrounding the charge to be adjudicated (attempting or planning to escape on August 21, 1984) with Principal Investigator A. Ortiz, Jr. of the the Internal Affairs Unit. Wiechnik also learned from Ortiz that Muhammad had refused to consent to a polygraph examination late in 1984.

Moreover, Wiechnik listened to the tape recording of a telephone conversation between a corrections officer and Leesther Williams of Jersey City, New Jersey. This conversation took place on August 30, 1984 and was the basis for the charge against Muhammad. Wiechnik made notes of the taped conversation for later use (Defendants' Exhibit 4).

---

1. Muhammad was given a copy of this on January 27, 1986 (Item 9, first page of Exhibit J-1).

Wiechnik then began the hearing. Present, in addition to Wiechnik, were Muhammad and a corrections officer who functioned as a clerk. No witnesses were presented on behalf of the Department of Corrections. Muhammad did not request that any witnesses (including Ortiz or Williams) appear and testify.

Stanley J. Hausman, Esq., who represented Muhammad at the time, was present at Rahway on the day of the hearing. Hausman spoke with Wiechnik before the hearing began and requested that Wiechnik allow him to be present either as Muhammad's counsel or as an observer. Wiechnik refused because there was no authority to permit Hausman to be present in either capacity.

Before the hearing commenced Muhammad requested that he have the assistance of a fellow inmate as a "counsel substitute" (Item 5, back of first page, Exhibit J–1). However, Muhammad did not renew this request with Wiechnik when the hearing began (Item 10, page 2 of Exhibit J–2). Thus, no counsel substitute was present. In any event, Muhammad did not qualify for the assistance of a counsel substitute as allowed by Standard 254.17.

Wiechnik informed Muhammad that he had listened to the tape recording. Using his notes Wiechnik questioned Muhammad about certain statements made by Williams. Wiechnik then disclosed his understanding of Williams' statements.

Williams stated that Muhammad had told her that he wanted the keys to Williams' apartment, that he would turn up one day at her doorstep, that he could put on "plain clothes" and leave Rahway, and that he wanted money from Williams. These statements, if credited, gave rise to a reasonable inference that Muhammad was planning to escape.

Wiechnik never played the tape recording for Muhammad. It was never offered into evidence. Indeed, Wiechnik could not bring the tape recording to the hearing because of security procedures which prohibited certain items being brought into the "secured perimeter" of Rahway, within which the hearing occurred.

Muhammad advised Wiechnik that he had told Williams that he no longer wanted to see her and that she had threatened him. Muhammad offered into evidence letters which he had received from Williams (Exhibits J–3 through J–6) to show her state of mind. The letters demonstrated that Williams had a relationship with Muhammad which had ended, that she was jealous of any other relationship he might have, and that she had threatened Muhammad. Muhammad's testimony, if credited, gave rise to a reasonable inference that Williams fabricated the statements she attributed to Muhammad to implicate him falsely. Muhammad denied that he was guilty of the charge against him.

Wiechnik was uncertain about Muhammad's guilt or innocence at the conclusion of the February 4 hearing. He advised Muhammad that he would undertake a further investigation and offered Muhammad the opportunity to take a polygraph examination. Wiechnik's purpose in making this offer was to use the examination results to determine Muhammad's credibility. Wiechnik adjourned the hearing to a later date.

In the interim, Muhammad was offered the opportunity to take the examination. After having been presented with a consent form (page 3 of Defendants' Exhibit 6), Muhammad discussed with Hausman whether he should execute the consent and take the examination. On advise of Hausman, Muhammad refused to execute the consent. Accordingly, the examination did not take place.

By letter dated March 5, 1986 (page 2 of Defendants' Exhibit 6), the polygraph examiner who was to have administered the examination reported to the Rahway Superintendent on Muhammad's refusal. This letter was sent in response to an inquiry by Wiechnik. Wiechnik also spoke with the examiner and made notes of that conversation (page 1 of Defendants' Exhibit 6).

In addition to the above, Wiechnik raised with Ortiz the question of Williams' credibility. In response, Ortiz forwarded a memorandum dated February 1, 1986 (De-

fendants' Exhibit 3) to Wiechnik. Ortiz stated:

> I vaguely remember Muhammad discounting the veracity of Ms. Williams' allegation. I have no knowledge of the letters that Muhammad presents as evidence. However, I wish to point out that Ms. Williams, in her testimony, indicated specific information as the possible means of escaping that an ordinary individual would not have without an insider for an (i.e., inmate) giving her the details.

Wiechnik relied on this opinion from Ortiz in determining that Williams was credible.[2] In addition, Wiechnik relied on the tone of her voice as recorded on the tape.

The hearing resumed on March 11, 1986. At the hearing Wiechnik marked into evidence, in addition to the tape recording itself,[3] the Internal Affairs report of September 4, 1984 (Defendants' Exhibit 2), a transcript of the tape recording (Defendants' Exhibit 5), the Ortiz memorandum of February 1, 1986 (Defendants' Exhibit 3), the March 5, 1986 letter from the polygraph examiner (page 2 of Defendants' Exhibit 6), and a memorandum from Rahway to the Internal Affairs Unit Polygraph Section dated September 12, 1984 (Defendants' Exhibit 7). This memorandum requested that Muhammad take a polygraph examination in late 1984 which, as set forth above, he refused to do.

All of the documents referred to above were provided to Wiechnik with the understanding that the Department of Corrections treated these as confidential.[4] Wiechnik did not make the documents available to Muhammad, nor did Wiechnik afford Muhammad an opportunity to review the documents. Wiechnik made no independent determination whether these documents should be treated as confidential at the hearing but, instead, relied entirely on the confidentiality label supplied by Corrections.[5]

This reliance by Wiechnik represented a complete abrogation of any responsibility to determine whether a given document should be deemed confidential. For example, one reason asserted by Corrections for the confidential nature of the transcript of Williams' telephone conversation was the desire to protect her anonymity. However, Muhammad was aware that Williams was the source of the allegation against him (see Item 8, Exhibit J–1). Indeed, the record is silent as to any factual basis for confidentiality.

Wiechnik determined that Muhammad was guilty. As a sanction, Wiechnik classified Muhammad's custody status as "maximum" for reasons set forth in item 19, first page of Exhibit J–2. The written decision is set forth in the "Adjudication of Disciplinary Charge" (Exhibit J–2), a copy of which Muhammad received. The "Summary of Testimony or evidence relied on," as set forth in that document, was as follows:

> I/A [Internal Affairs] reports that the RSP [Rahway State Prison] camp officer of the time received a phone call from a female visitor of this I/M—she indicated that this I/M had discussed with her his ability to leave the camp (RSP) at any time (he wanted). See A–5 for details.
>
> I/A telephone conversation (tape A–1) support ... there was some discussion of I/M's ability and thinking about being on her doorstep further detailed ... conversation clarified the point to mean he was discussing ... [escaping] custody.

Wiechnik relied on the taped conversation with Williams as the basis for Muhammad's guilt. Wiechnik determined, based on Ortiz's opinion and Williams' tone of voice, that she was credible.

---

**2.** Williams had visited Muhammad at Rahway in the past and had an adequate opportunity to learn the "details" mentioned by Ortiz.

**3.** Defendants proffered the tape into evidence. I declined to admit it. *Fed.R.Evid.* 403.

**4.** The "Adjudication of Disciplinary Charge" reflects Wiechnik's use of *certain* of these confidential documents (Item 14, first page of Exhibit J–2).

**5.** Wiechnik also kept confidential his notes of the tape recording and of his conversation with the examiner. His reason was that these notes were for his own use.

Wiechnik did not find Muhammad guilty because Muhammad refused to take the polygraph examination. However, Wiechnik did not have the benefit of the examination to test Muhammad's credibility. Muhammad's statements concerning Williams were consistent with her letters to Muhammad and, on that basis, Muhammad was credible. In Wiechnik's mind, Williams' statements about Muhammad and Muhammad's statements about her "cancelled each other out."

## CONCLUSIONS OF LAW

### A. *Federal Law.*

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the United States Supreme Court held that prisoners facing disciplinary charges for serious misconduct are protected by the Due Process Clause of the Fourteenth Amendment. 418 U.S. at 555–58, 94 S.Ct. at 2974–76. Specifically, the Court held that prisoners were entitled to:

> advance written notice of the claimed violation [418 U.S. at 563, 94 S.Ct. at 2978];
>
> a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken [418 U.S. at 563, 94 S.Ct. at 2978];
>
> call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals [418 U.S. at 566, 94 S.Ct. at 2979].

*See, e.g., Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985); *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985); *Baxter v. Palmigiano,* 425 U.S. 308, 310–21, 96 S.Ct. 1551, 1554–59, 47 L.Ed.2d 810 (1976).[6]

Significantly for the purpose of the action *sub judice,* however, *Wolff* refused to afford two additional rights to prisoners. First, as to confrontation and cross-examination:

> If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability. These procedures are essential in criminal trials where the accused, if found guilty, may be subjected to the most serious deprivations ... or where a person may lose his job in society.... But they are not rights universally applicable to all hearings.... Rules of procedure may be shaped by consideration of the risks of error ... and should also be shaped by the consequences which will follow their adoption.... We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination.
>
> Within the limits set forth in this opinion we are content for now to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of corrections officials administering the scope of such inquiries. [418 U.S. at 567–68, 94 S.Ct. at 2980 (citations omitted)].

Second, as to assistance of counsel:

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.
>
> Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate

---

**6.** In *Ponte,* the Court held that, "prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but that they may do so either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court...." 105 S.Ct. at 2196.

will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff. [418 U.S. at 570, 94 S.Ct. at 2981–82].

In *Superintendent v. Hill, supra,* the Court discussed the quantum of evidence required to support prisoner disciplinary rulings. The Court held:

the requirements of due process are satisfied if some evidence supports the decision.... This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced.....' Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, *the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.*

... We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances.... *The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.* [105 S.Ct. at 2774 (citations omitted) (emphasis added)].

Under the *Wolff* and *Hill* standards Muhammad received, at least in part, the process that was due him under the Fourteenth Amendment.

Muhammad received advanced written notice of the charge against him (Exhibit J–1). He also received a written statement of the evidence Wiechnik relied on and the reason for the sanction imposed (Exhibit J–2). Muhammad chose not to call witnesses (other than himself), although he did present documentary evidence (Exhibit J–3 through J–6).

Moreover, there was evidence in the record which could support the finding of guilt. This consisted of the tape recording, the transcript thereof (Defendants' Exhibit 5), and the Ortiz memorandum addressing Williams' credibility (Defendants' Exhibit 3). As in *Hill,* "[a]lthough the evidence in this case might be characterized as meager ..., the record is not so devoid of evidence that the findings ... were without support or otherwise arbitrary." 105 S.Ct. at 2775.

There remains the issue of Wiechnik's use of confidential information. In *Calloway v. Fauver,* 544 F.Supp. 584 (D.N.J. 1982), Judge Debevoise recognized that,

[i]f the disclosure of confidential documents would impair the ability of prison authorities to maintain control over potentially violent groups and would jeopardize the safety of informants, they need not be disclosed. [544 F.Supp. at 604].

The courts have dealt with the use of confidential information in a variety of ways.

The prisoner must have "notice of the facts underlying his alleged offense; identities of persons involved may be deleted if their inclusion would threaten institutional security." *Grady v. Wilken,* 735 F.2d 303, 305 (8th Cir.1984); *see Rinehart v. Brewer,* 483 F.Supp. 165, 169 (S.D.Iowa 1980).[7]

There must be some basis on which to establish the reliability of the confidential information. In *Helms v. Hewitt ("Helms I"),* 655 F.2d 487 (3d Cir.1981), *rev'd on other grounds,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Third Circuit Court of Appeals discussed the use of confidential information as follows:

Other courts of appeals, faced with claims similar to those pressed here, have read *Wolff* to command almost complete deference to the judgment of prison officials on the need, if any, for administrative inquiry into the credibility and reliability of an informant.... In the

7. Muhammad received sufficient notice (Exhibit J–1).

cited commentary, the authors contend that these courts have properly employed the 'arbitrary and capricious' standard of review, limiting their judicial function to determining whether *any* evidence was offered in support of the administrative decision.... Further, they argue that this determination has been, and should be, made without regard to the admissibility of the evidence under legal rules of evidence....

We believe, however, that in entrusting to prison officials responsibility for promulgating procedures for arriving at an adequate basis for decision, *Wolff intended a genuine, even if single, factfinding hearing and not a charade.* Although the HC has the discretion to foreclose the presence of witnesses and cross-examination, *Wolff* abjures arbitrary determinations. It therefore commands 'a written statement by the factfinder as to the evidence relied on and reasons' for the disciplinary action. If this statement is intended to withstand scrutiny and win respect for prison disciplinary procedures, it must disclose more than a mere 'reliance on speculation and facts not in the record.' *Gomes v. Travisono,* 510 F.2d 537, 540 (1st Cir.1974).

\* \* \* \* \* \*

Under the tension and strains of prison living fraught with intense personal antagonisms, determination of guilt solely on an investigating officer's secondary report of what an unidentified informant advised him, albeit by affidavit, invites disciplinary sanctions on the basis of trumped up charges. A determination of guilt on such a record, with no primary evidence of guilt in the form of witness statements, oral or written, or any form of corroborative evidence, amounts to a determination on the blind acceptance of the prison officer's statement. Such a practice is unacceptable; it does not fulfill *Wolff's* perception of 'mutual accommodation between institutional needs and objections' and constitutional requirements of due process. *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2974. *We realize that in prison disciplinary proceedings hearsay may serve a useful purpose and we do not preclude it. But when the tribunal's task as a factfinder is to evaluate credibility and assess reliability of the evidence presented, this process is 'severely hampered' if the tribunal is permitted to rely upon mere conclusory representations.* Bartholomew v. Reed, 477 F.Supp. 223, 228 (D.Or.1979). We therefore hold that when a prison tribunal's determination is derived from an unidentified informant, the procedures approved in *Gomes v. Travisono* must be followed to provide minimum due process.

'(1) [T]he record must contain some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement.'

510 F.2d at 540.

\* \* \* \* \* \*

Although a prisoner may not have any constitutional interest in where he is confined within a correctional facility, we hold that once the State by either statute or rule confers a protectable liberty interest in not being confined in restrictive custody, that interest may not be infringed without affording him the minimal procedural safeguards appropriate to the circumstances as described in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Wright v. Enomoto,* 462 F.Supp. 397 (N.D.Cal. 1976), *aff'd mem.,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). *We further hold that a prisoner is denied due process when his conviction on disciplinary charges rests solely on a hearsay report of an unidentified informant's account which offers no basis for an independent assessment of the informant's credibility or reliability.* [655 F.2d at 501–03 (emphasis added)].

See, e.g., Sanchez v. Miller, 792 F.2d 694, 699–701 (7th Cir.1986); Helms v. Hewitt ("Helms II"), 780 F.2d 367, 370 (3d Cir.), cert. granted, —— U.S. ——, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986); Calloway v. Fauver, supra, 544 F.Supp. at 604. In Mendoza v. Miller, 779 F.2d 1287 (7th Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986), the Seventh Circuit Court of Appeals addressed the need for reliability as follows:

> The reliability of confidential informants may be established by: (1) the oath of the investigating officer as to the truth of his report containing confidential information and his appearance before the disciplinary committee, McCollum, [v. Miller], 695 F.2d [1044] at 1049 [(7th Cir.1982)]; (2) corroborating testimony, Jackson [v. Carlson], 707 F.2d [943] at 948 [(7th Cir.1983)]; (3) a statement on the record by the chairman of the disciplinary committee that, 'he had firsthand knowledge of the sources of information and considered them reliable on the basis of 'their past record of reliability," Id. at 948; or (4) in camera review of material documenting the investigator's assessment of the credibility of the confidential informant. Dawson, [v. Smith], 719 F.2d [896] at 899 [(7th Cir.1983)]..... Our review of the determination of reliability is deferential because, 'it is inherently dangerous to even attempt to determine the reliability of an informant since such effort could jeopardize lives and the willingness of informants to continue providing information.' Id. Prison officials are given broad discretion when balancing the inmate's due process interests against the government's interests in institutional safety and an efficient disciplinary system. Chavis v. Rowe, 643 F.2d 1281, 1286 (7th Cir.1981). The findings of the prison disciplinary board must be supported by some evidence in the record. Superintendent, Massachusetts Correctional Institution at Walpole v. Hill [472] U.S. [445], 105 S.Ct. 2768, 2770, 86 L.Ed.2d 356 (1985). Judicial review determines 'whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.' Id. at 105 S.Ct. at 2774. [779 F.2d at 1294].

"Indicia of reliability provide additional protection when other rights of the accused have been circumscribed in the relatively informal setting of prison disciplinary proceedings." Sanchez v. Miller, supra, 792 F.2d at 701.[8]

Confidential information must also be dealt with in the written decision required by Wolff. In Rinehart v. Brewer, supra, the court held that, "such information may be omitted if the statement on its face indicates that the information has been deleted, and if a brief written summary of the confidential information is prepared." 483 F.Supp. at 170. But cf. Langton v. Berman, 667 F.2d 231, 234 (1st Cir.1981) (written statement not required in record as "it is obvious from the nature of some of appellant's complaints that he was aware of the critical nature of informant information").

These various decisions, however, presuppose that information was properly deemed to be confidential. In McIntosh v. Carter, 578 F.Supp. 96 (W.D.Ky.1983), the court required administrative officials, "to demonstrate the 'security reasons' surrounding the denial of access" to an alleged confidential document. 578 F.Supp. at 98. Similarly, in Rinehart v. Brewer, supra, the court held that the written decision must indicate why, "the confidential information should in fact be kept confidential." 483 F.Supp. at 170.[9]

---

8. Helms I is not directly on point. It addressed the use of conclusory information furnished by a confidential informant which lacked sufficient facts to allow an administrative determination as to credibility. Here, in contrast, the identity of the informant was known, the information conveyed was factual, and Wiechnik had the benefit of Ortiz's opinion (Defendants' Exhibit 3) and Williams' own voice in assessing her credibility. See Findings of Fact at 1475–77.

9. Helms I, McIntosh and Rinehart appear to be inconsistent with Ponte v. Real, supra, to the extent that those decisions require the administrative record to include reasons for confidentiality. Under Ponte, it should be sufficient for such reasons to be presented to a reviewing court.

Measured against these standards, Muhammad was denied due process. First, Wiechnik made no determination as to the need to treat any document as confidential, although Standard 254.18 vested that discretionary decision with him. This is hardly consistent with *Wolff,* which "intended a genuine, even if single, factfinding hearing and not a charade." *Helms I, supra,* 655 F.2d at 502. Second, there was no demonstration, either in the administrative record or before me, of the reasons for the confidentiality determination by the Department of Corrections.[10]

## B. *State Law.*

In *Avant v. Clifford,* 67 N.J. 496, 341 A.2d 629 (1975), the New Jersey Supreme Court addressed the validity of Standard 254 as it then existed. Chief Justice Hughes, writing for the court (and with some modifications), upheld the Standard under both the Due Process Clause and "the 'rightness and fairness' standard now firmly established in New Jersey law." 67 N.J. at 527, 341 A.2d 629. I have reviewed Standard 254 as it now exists,[11] and I am satisfied that, with one possible exception, it is consistent with *Avant.* That one exception pertains to confrontation and cross-examination.

Chief Justice Hughes held that,

[t]he opportunity for confrontation and cross examination shall be provided to the inmate in such instances where the Adjustment Committee [or hearing officer] deems it necessary for an adequate

presentation of the evidence, particularly when serious issues of credibility are involved .... [67 N.J. at 529–30, 341 A.2d 629].

Standard 254.19 provides:

The opportunity for confrontation and cross examination, *if requested,* shall be provided to the inmate in such instances where the Adjustment Committee or Hearing Officer deems it necessary for an adequate presentation of the evidence, particularly when serious issues of credibility are involved. The Hearing Officer or Adjustment Committee may refuse confrontation and cross-examination when said would be unduly hazardous to institutional safety or goals. [emphasis added].

Standard 254.19 limits the obligation of the hearing officer to determine the necessity for confrontation and cross-examination to instances when a prisoner requests it. *Avant,* on the other hand, might be construed to contemplate that the hearing officer make an initial decision as to necessity, at which point the opportunity for confrontation and cross-examination "shall be provided." Such a construction, however, appears foreclosed by *Avant'*s reliance on *Clutchette v. Procunier,* 510 F.2d 613 (9th Cir.1974), *rev'd sub nom. Enomoto v. Clutchelle,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), which spoke of the privilege of confrontation and cross-examination in instances when requested by a prisoner. *See O'Neal v. New Jersey State Parole Board,* 149 N.J.Super. 174, 185, 373

---

The requirement of *Helms I, McIntosh* and *Rinehart* that the administrative record include evidence of credibility or reliability, on the other hand, are consistent with *Superintendent v. Hill, supra. See Sanchez v. Miller, supra,* 792 F.2d at 705 (dissenting opinion).

**10.** Item 14 of the Adjudication of Disciplinary Charge (Exhibit J–2) lists "confidential materials used." Item 15 lists as the "[r]eason for withholding from inmate," "[t]o [p]reserve source/security."

This reason is merely conclusory and, as set forth in the Findings of Fact at 1476, is without support in the record. As to the list of confidential materials used, all listed documents were produced at the hearing. Production at that time was consistent with *Ponte. See* footnote 6.

Wiechnik did testify that the tape recording could not be brought within the secured perimeter because of the experience during the Attica riots, when evidence was destroyed. Whether such testimony should come from Wiechnik, the independent factfinder, is questionable. In any event, his testimony was not factual in nature.

**11.** Standard 254 was codified only recently at N.J.A.C. 10A:4–1.1 *et seq. See* 19 N.J.R. 27(a) and 1465(a). It was discussed to some degree by the Appellate Division in *Jenkins v. Fauver,* No. A–3210–84T5 (App.Div. Apr. 1), *certif. granted,* No. 25,534 (Sup.Ct. Oct. 6, 1986). A copy of *Jenkins* is attached.

A.2d 657 (App.Div.), *appeal dismissed*, 75 N.J. 590, 384 A.2d 821 (1977).

Under New Jersey law,

> confrontation ... provides an opportunity for cross-examination and allows the trier of fact to observe the demeanor and manner of testimony of the witness in order to assist in determining whether he is worthy of belief. [*Division of Youth and Family Services v. S.S.*, 185 N.J. Super. 3, 6, 447 A.2d 183 (App.Div. 1982)].

Nevertheless, the New Jersey courts are sensitive to the "charged atmosphere" of disciplinary proceedings, and leave to the discretion of prison administrators the affording of confrontation and cross-examination. *See O'Neal v. New Jersey State Parole Board, supra*, 149 N.J.Super. at 185–86, 373 A.2d 657. Here, as Wiechnik appreciated, Williams' credibility was a central issue. Likewise, although to a lesser degree, Ortiz's credibility was in issue. Nevertheless, and consistent with the analysis set forth above, Muhammad was obligated to request the opportunity for confrontation and cross-examination in the first instance.

Wiechnik lacked subpoena power to compel Williams' appearance. *See* Standard 254.5. I need not consider the effect of that, however, since the record is silent as to any request by Muhammad for, or consideration by Wiechnik of the necessity for, confrontation and cross-examination.

Standard 254.19 contemplates that a prisoner may waive confrontation and cross-examination. Yet, at least for Sixth Amendment purposes, "[a] waiver ... is ordinarily valid only if there is 'an intentional relinquishment of a known right or privilege.'" *United States v. Thevis*, 665 F.2d 616, 630 (5th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982) (quoting from *Johnson v. Zerbst*, 304 U.S. 458, 464,

58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Consistent with *Avant's* requirement that prisoners be advised of their rights to remain silent and to make a statement, and of the availability of use immunity, 67 N.J. at 544, 341 A.2d 629, I predict that, under the rightness and fairness doctrine, the New Jersey Supreme Court would require that prisoners be advised of their opportunity for confrontation and cross-examination.[12]

Another issue arises with Wiechnik's use of confidential documents. The use of documents as evidence in disciplinary proceedings is sanctioned under New Jersey law. As the court stated in *O'Neal v. New Jersey State Parole Board, supra*,

> [i]mplicit in appellant's complaint of lack of confrontation of the witnesses is his further contention that the Board erred in relying upon the police report which indicated that the witnesses had identified O'Neal as a participant in the robbery. Use of the police reports is not improper. In fact in *Morrissey [v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)], the court recognized that even revocation proceedings should be flexible enough to consider eivdence 'including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.' 408 U.S. at 489, 92 S.Ct. at 2604. Further, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), pointed out that *Morrissey* did not 'intend to prohibit use where appropriate of the conventional substitutes for live testimony ...' 411 U.S. at 782, 93 S.Ct. at 1760, n. 5 [149 N.J.Super. at 186, 373 A.2d 657].

Standard 254.18 provides, in pertinent part, as follows:

> The Hearing Officer may take testimony in a manner or form which the Hearing Officer or Adjustment Committee deter-

---

**12.** "A variety of actions by the accused constitute an express waiver of the right to confrontation." *United States v. Thevis, supra*. Thus, an accused's introduction of statements may operate as a waiver of his right to challenge the prosecution's use of other statements by that witness. *Cf. Olson v. Green*, 528 F.Supp. 27, 30 n. 2 (D.Minn.1980), *aff'd*, 668 F.2d 421 (8th Cir.), *cert. denied*, 456 U.S. 1009, 102 S.Ct. 2303,

73 L.Ed.2d 1305 (1982). No waiver issue is here present, however, since Muhammad introduced Williams' letters (Exhibits J–3 through J–6) only to show her state of mind. *United States v. DeCarlo*, 458 F.2d 358, 364 n. 5 (3d Cir.), *cert. denied*, 409 U.S. 843, 93 S.Ct. 112, 34 L.Ed.2d 83 (1972).

mines is necessary to protect institutional safety or goals. Such manner or form shall include, but shall not be limited to, the consideration of confidential reports.

Again, however, for the purpose of promoting "fairness" in administrative hearings, I predict that the New Jersey Supreme Court would sanction the use of confidential documents only if the hearing officer makes an independent determination of reliability and of the need for confidentiality to be maintained. As set forth in the Findings of Fact at 1476, there is nothing in the record to demonstrate that any document should have been treated as confidential.

Turning to the merits of the hearing, Standard 254.20 provides that,

[a] finding of guilt at a disciplinary hearing shall be based upon substantial evidence that the inmate has committed a prohibited act. Evidence relied upon in making a determination shall be specified on the adjudication form.

"Substantial evidence," as that term is used in New Jersey law, is misleading. As the court stated in *Mead Johnson and Co. v. South Plainfield*, 95 N.J.Super. 455, 231 A.2d 816 (App.Div.1967),

[w]e are mindful of the limited scope of our appellate review of determinations of administrative agencies. *We may not substitute our independent judgment for that of the board or agency where its findings are supported by substantial evidence, i.e., such evidence as a reasonable mind might accept as adequate to support a conclusion. In re Public Service Electric and Gas Co.*, 35 N.J. 358, 376 [173 A.2d 233] (1961). So, too, it is not our function to weigh the evidence, to determine the credibility of witnesses, to draw inferences and conclusions from the evidence and to resolve conflicts therein. *Hornauer v. Division*

*of Alcoholic Beverage Control*, 40 N.J. Super. 501, 504 [123 A.2d 574] (App.Div. 1956). [95 N.J.Super. at 466–67, 231 A.2d 816 (emphasis added)].

Thus, judicial review is limited.

Here, the evidence revealed classic questions of drawing inferences and assessing credibility. Moreover, Williams' tape-recorded statements, together with Ortiz's opinion of her credibility, constituted "substantial evidence" of Muhammad's guilt.[13]

## C. *Remedies Available.*

Having undertaken to evaluate the hearing under New Jersey law, as I am required to do under the July 15, 1986 Order, I question whether Muhammad has a remedy in this Court.

In *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that, under the Eleventh Amendment, the District Courts were prohibited from ordering state officials to conform their conduct with state law. 465 U.S. at 103–17, 104 S.Ct. at 909–17. As in *Halderman*, the relief ordered here was "institutional and official in character." 465 U.S. at 108, 104 S.Ct. at 912. Thus, I conclude that, under *Halderman*, this Court should not, consistent with the Eleventh Amendment, address Muhammad's right under either Standard 254 or the rightness and fairness doctrine.

## RECOMMENDATION

The hearing afforded Muhammad was not consistent with the Due Process Clause of the Fourteenth Amendment. Although that hearing raises questions of validity under New Jersey law, the Court is barred

---

**13.** Standard 254.7 requires that the Disciplinary Report (Exhibit J–1) "be served upon the inmate within 48 hours after the violation unless there are exceptional circumstances." That time limit was not met. However, the judicial mandate of the December 5, 1985 Order constituted an "exceptional circumstance" justifying the belated service on Muhammad.

Standard 254.17 allows prisoners to have the assistance of a counsel substitute when, "an

inmate is illiterate or cannot adequately collect and present evidence in his own behalf." Muhammad's literacy and ability to act on his own behalf cannot be disputed. Thus, he had no right to the presence of a counsel substitute, as he had no right to the assistance of counsel. *See Avant v. Clifford, supra,* 67 N.J. at 529, 537, 341 A.2d 629.

by the Eleventh Amendment from addressing those questions.

Accordingly, I recommend that Muhammad be restored to minimum custody status forthwith,[14] that his claims for injunctive relief under State law be dismissed, and that the Court address Muhammad's claim, if any, for damages.

The parties are reminded that, pursuant to General Rule 40D(5) of this Court, they may object to this Report and Recommendation within 10 days after being served with a copy hereof. Written objections must be filed with the Clerk and served on all parties, which "shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis of such objection." General Rule 40D(5); *see* 28 U.S.C. § 636(b).

## APPENDIX

CHARLES JENKINS, et al,
Appellants-Respondents,

vs.

WILLIAM H. FAUVER, et al,
Respondents-Petitioners.

## SUPREME COURT OF NEW JERSEY

## ON PETITION FOR CERTIFICATION

To the Appellate Division, Superior Court:

A petition for certification of the judgment in A–3210–84T5 having been submitted to this Court, and the Court having considered the same;

It is ORDERED that the petition for certification is granted.

## ON CROSS PETITION FOR CERTIFICATION

To the Appellate Division, Superior Court:

A cross petition for certification of the judgment in A–3210–84T5 having been submitted to this Court, and the Court having considered the same;

It is ORDERED that the cross petition for certification is granted.

**14.** This restoration should, of course, be subject to any intervening disciplinary proceedings

## APPENDIX

## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS

CHARLES JENKINS, et al., Appellants,

v.

WILLIAM H. FAUVER, et al.,
Respondents.

## SUPERIOR COURT OF NEW JERSEY

## APPELLATE DIVISION

Argued: March 4, 1986

Decided: Apr 1, 1986

On appeal from Administrative Action of the New Jersey Department of Corrections.

Steven E. Nelson argued the cause for appellants (Karasic, Stone & Susser, attorneys; Mr. Nelson of counsel and on the brief).

Catherine M. Brown, Deputy Attorney General argued the cause for respondents Fauver, Hilton, Seidl, Moss, Ironhorn, Rafferty, Julian and Miller (W. Cary Edwards, Attorney General of New Jersey, attorney (James J. Ciancia, Assistant Attorney General, of counsel; Arthur W. Burgess, Director of Law and Ms. Brown, on the brief).

Mark P. Rockwell argued the cause for respondent Philip M. Cerria, Mayor of Woodbridge (Franchino, Lenahan & Cross, attorneys (Mr. Rockwell, on the brief).

Before Judges Pressler, Dreier and Bilder.

PER CURIAM.

Plaintiffs-appellants have appealed from administrative orders affecting their residences and status. They are 45 Rahway State Prison inmates who contend they were denied due process when they were transferred from the minimum-security Rahway Camp to residences within the adjacent main prison. Their custodial classification was changed from "full minimum" to "full minimum, inside only" or "gang

which may have resulted in changes to Muhammad's status.

minimum." Since we here determine that the change in housing did not affect a protectible interest and the reclassification of some inmates to the makeshift category of "full minimum, inside only" did not constitute an actionable deprivation, we affirm the administrative action in substantial part. We remand, however, for a determination of whether those few inmates whose status was increased to "gang minimum" were afforded the procedural safeguards provided by Department of Correction (D.O.C.) standards.

In August, 1984 an inmate escaped from the Rahway Camp. On September 6, 1984 the Municipal Council of nearby Carteret demanded the resignation of the prison superintendent "by virtue of his apparent inability to protect the citizens of the Borough of Carteret." On September 23, 1984 another inmate escaped. Both had been convicted of violent crimes, one for murder. The next day the mayor of Woodbridge, another neighboring municipality, instituted legal proceedings in the Chancery Division to close Rahway Camp. Three days later an assistant commissioner of the D.O.C. directed the prison superintendent to relocate men with homicide histories or whose convictions were for crimes engendering notoriety from the Camp to the main prison. Following meetings of the D.O.C.'s Classification Committee, 94 inmates were relocated and reclassified. Although a number were transferred with "full minimum" status within other minimum security facilities, those who have remained at Rahway under both "full minimum—inside only" and "gang minimum" status have prosecuted this appeal.

Liberty interests protected by the Fourteenth Amendment may arise from either the Due Process Clause itself or the laws of the States. *Hewitt v. Helms,* 459 *U.S.* 460, 466, 103 *S.Ct.* 864 [868], 74 *L.Ed.*2d 675, 685 (1983). Even state statutes and regulations governing the daily operation

of prisons can give rise to a liberty interest where the language is "of an unmistakably mandatory character." *Id.* 459 *U.S.* at 471 [871], 74 *L.Ed.*2d at 688. Not only can state rules create liberty interests apart from those found in the Due Process Clause, but our judicial interpretation of corresponding provisions in our State Constitution, *N.J.Const.* (1947), Art. I, § I, can afford protection greater than that provided by the Federal Constitution. *See, State v. Roth,* 95 *N.J.* 334, 344–45 [471 *A.2d* 370] (1984). Thus under *Avant v. Clifford,* 67 *N.J.* 496, 520–21 [341 *A.2d* 629] (1975), we must consider whether the procedures employed were "fair" and "right" in relationship to the purported deprivations. Also under *N.J. Parole Bd. v. Byrne,* 93 *N.J.* 192, 197 [460 *A.2d* 103] (1983) we should examine the legitimacy of any expectations which the inmates may have had for continued status derived from the applicable D.O.C. Standards. We will, therefore, direct our inquiry first to the transfer of residence and next to the changes in classification.

I

Inmates do not have a protectible interest arising from the Due Process Clause alone in residing in a particular environment. In *Hewitt,* plaintiff was removed from the general prison population and placed in "administrative segregation"[1] pending the investigation of disciplinary charges against him. The Court declared that "[i]t is plain that the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." 459 *U.S.* at 468 [103 *S.Ct.* at 869]. Nevertheless the court found that the inmate's expectation of remaining in the general population arising from Pennsylvania statutes and regulations warranted employment of the procedural safeguards contained in those provisions.

1. That segregation was solitary confinement for nearly 24 hours a day with infrequent opportunities to shower, change clothes or exercise. 459 *U.S.* 479, fn. 1 [103 *S.Ct.* 875, fn. 1], 74 *L.Ed.* 2d [693], fn. 1 (Blackman, concurring in part and dissenting in part). In the present case the transfer to the main prison was not accompanied by any such deprivation of ordinary amenities.

Here no reasonable expectation of housing in a less restrictive facility would arise from D.O.C. Standards. Standard 853.3c provides that:

Inmates classified as full minimum must be assigned to either: (1) work details, jobs, or programs outside the main institution, on or off institutional grounds, with minimal supervision, or (2) a satellite unit or minimum security trailer unit, or (3) both (1) and (2).

The disjunctive "or" makes unreasonable the alleged inmate expectation that if he is classified "full minimum," he must be housed in a satellite or minimum security trailer unit. The Standard could be satisfied simply by assigning the inmate to a minimally supervised work detail outside the main institution.

Even if plaintiffs had some interest in more amenable housing, such interest would be outweighed by well-founded safety concerns expressed by local communities. In view of the need for community support for many ongoing correctional programs such as work release, halfway houses, or the like, the reasonably-based sentiment of the communities surrounding a prison is a valid consideration for decisions affecting prison policies. To the extent the transfer was a manifestation of the D.O.C.'s legislative mandate to securely house inmates and was an accommodation to surrounding communities, the D.O.C. could fairly strike the balance it did between competing interests. *Mathews v. Eldridge*, 424 *U.S.* 319, 335, 96 *S.Ct.* 893 [903], 47 *L.Ed.*2d 18, 33 [ (1976) ]. The summary transfer was within the "wide-ranging deference" accorded prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 *U.S.* 520, 547, 99 *S.Ct.* 1861 [1878], 60 *L.Ed.*2d 447, 474 (1979).

II

In contrast are the changes in status which plaintiffs' claim have upset more reasonable expectations and serve less discernable State interests. The D.O.C. Standards establish but three distinct levels of custody: maximum, gang minimum and full minimum. When inmates enter the institution they are classified as maximum. In accordance with intricate D.O.C. formulas relating the length of sentence and the amount of time spent in custody, inmates become "eligible for consideration" for reduced custody classification. Corresponding to each level of custody are assorted privileges allowing increased opportunities to obtain work credits toward early release and to participate in certain rehabilitation programs. *See, Muhammad v. Butler*, 655 *F.Supp.* 1466, 1467 (1985). Since those inmates reclassified as "full minimum, inside only," did not lose any of the privileges associated with "full minimum" status, and the designation "inside only" simply refers to where the inmates are to be housed, we find that this reclassification did not amount to a deprivation at all, let alone a deprivation of a protectible interest.

However, those inmates reclassified as "gang minimum" were precluded from enjoying the privileges of "full minimum" status. They could have reasonably contemplated that their status would have been retained indefinitely and not increased without conformance with ascertainable standards. As in *Hewitt*, plaintiffs' expectations were grounded in the mandatory language of a regulation. D.O.C. Standard 853.4b sets forth the sole procedures that must be followed if custody status is to be increased, and this regulation is applicable only to such changes by prison authorities other than the Classification Committee.

In an emergency situation, or when additional information is received which negatively affects an inmate's suitability to remain in reduced custody, (i.e., Parole Board decisions, escape plans, etc.) the inmate's custody level can be increased, temporarily, by order of the Superintendent, Assistant Superintendent or Director of Custody Operations. However, such changes must be reviewed and approved by the Institution Classification Committee at its next regularly scheduled meeting.

The Committee itself is governed by elaborate guidelines in reducing status, but no provision is made for its increasing an inmate's status. We reject, however, respondents' contention that this absence affords the Committee unfettered discretion since "[t]he touchstone of Due Process is freedom from arbitrary governmental action." *Ponte v. Real,* [471] *U.S.* [491] [495, 105 *S.Ct.* 2192, 2195], 85 *L.Ed.*2d 553, 558 (1985). A permanent increase in custody status is permissible only if made by the Classification Committee. If the change is temporary, Standard 853.4b may be followed to effect the status change until the next meeting of the Classification Committee; but a review of this action is required, and a permanent change must be made by the Committee. Although we have been informed by the State that there is no specific regulation generally governing the increase in status, the Committee is implicitly empowered to make such change. However, any such change in an individual's classification must be for cause and not arbitrary[2]. Since the record does not reveal whether these standards were followed, further findings are necessary to demonstrate that any change to "gang minimum" was for cause and not arbitrary.

The D.O.C. should assess the individual increases to "gang minimum" status in light of the D.O.C. disciplinary procedures outlined in *Muhammad v. Butler, supra,* requiring, prospectively, a hearing within seven days of the alleged infraction, the opportunity to call witnesses and to present documentary evidence, that any finding of guilt be based on substantial evidence and that after the hearing the inmate receive a written statement of the fact findings. *Id.* 655 *F.Supp.* at 1467.

We remand this matter to the Commissioner of Corrections for reference to the Classification Committee. If the Committee determines that any "gang minimum" reclassification had been imposed other than for cause, it shall immediately rehear the matter. If no cause is found to have existed the inmate shall immediately and retroactively be reclassified as "full minimum." Interim antisocial behavior, of course, may also affect the inmates' current status. We further recognize that if an inmate is to remain a Rahway resident, he may be assigned the "inside only" designation which we here determined has not adversely affected any substantial right.

The administrative actions appealed from are affirmed as to the inmates reclassified as "full minimum-inside only," and remanded in part for reconsideration in accordance with this opinion as to the inmates reclassified "gang minimum."

---

**2.** We are not here concerned with a general change in the classification system which well might be without cause relating to an individual inmate, so long as the new classifications are not arbitrary.